## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THE LOVESAC CORPORATION, ET AL., | ) Case No. 06-10080 (CSS) |
| | ) |
| Debtors. | ) Jointly Administered |
| ——————————————————— | ) |
| | ) |
| THE LIQUIDATING TRUST OF | ) |
| THE LOVESAC CORPORATION, ET AL., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Pro. No. 08-50250 (CSS) |
| | ) |
| CRAIG COX, POWDER MOUNTAIN | ) Docket No. 21 |
| GROUP HOLDINGS, LLC, and NIELSON | ) |
| LIVESTOCK, LLC, | ) |
| | ) |
| Defendants. | ) |
| ——————————————————— | ) |

## OPINION[1]

Richard M. Beck
Klehr Harrison
Harvey Branzburg LLP
919 Market Street
Suite 1000
Wilmington, Delaware  19801

Counsel for Plaintiff.

Kathleen Miller
Smith, Katzenstein & Furlow LLP
800 Delaware Avenue
10th Floor
P.O. Box 410
Wilmington, Delaware  19899
-and-
Noel S. Hyde
5926 South Fashion Pointe Drive
Suite 200-D
South Ogden, Utah  84403

Counsel for Defendants.

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052.

Dated:  January 15, 2010

Sontchi, J. _____

## INTRODUCTION

Before the Court is the Liquidating Trust of The Lovesac Corporation's Motion for Summary Judgment as to Real Estate Transfer.  For the reasons set forth below, the Court finds that summary judgment is inappropriate due to the existence of triable issues of fact surrounding the land transfer at issue in the instant adversary proceeding.  Accordingly, the Court will deny the Motion.

## STATEMENT OF FACTS

The Lovesac Corporation ("Lovesac") engaged in the manufacture and retail sale of high-end bean bag furniture.  On January 30, 2006, Lovesac and affiliated Debtors filed voluntary Chapter 11 petitions in this Court.  On July 28, 2006, a Joint Plan of Liquidation filed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan") was confirmed.  The Plan subsequently became effective on August 11, 2006.  Upon the effectiveness of the Plan, the Liquidating Trust was established and all of the Debtors' assets were transferred to the Liquidating Trust for liquidation.  Pursuant to the terms of the Plan, the Liquidating Trust enjoys all rights of the Debtors with respect to the instant cause of action.

At issue in this case is the transfer and reconveyance of title to certain real property consisting of approximately 100 acres of the Powder Mountain Ski

Resort, Cache County, Utah, known as Powder Mountain Parcel 5 (the

"Property"). On May 27, 2004, Lovesac executed a document entitled "Financing

and Relationship Agreement" (the "Agreement").[2] The Agreement states that

Defendant Powder Mountain Group Holdings, LLC ("PMGH") "has real

property which it is willing to permit to be pledged by Lovesac to obtain debt

financing under the terms and conditions hereinafter set forth."[3] Specifically,

PMGH agreed to:

> convey legal title to [the Property] to Lovesac in fee to
> permit Lovesac to use said lands as collateral for
> financing required by Lovesac for its ongoing
> operations and for its planned expansion activities,
> but PMGH shall retain beneficial title to said lands.
> In connection with such conveyance PMGH agrees
> that PMGH does not have nor will it ever claim an
> interest in said lands which is superior to the interest
> of a lender to Lovesac which has taken a security
> interest in [the Property] as collateral for the funds
> advanced to Lovesac. PMGH's compensation for
> such conveyance is set out in a Memorandum of
> Understanding of even date herewith involving the
> parties to this agreement.[4]

The Agreement also contains a clause purporting to limit the extent of Lovesac's

interest in the Property:

> Regardless of the conveyance of legal title to the
> [Property] to Lovesac contemplated by this
> Agreement, and while Lovesac shall enjoy the right to
> pledge the same for the financing of its business
> activities as contemplated by this Agreement, PMGH,

---

[2] See Defendant's Br. in Opp'n to Motion for Partial Summ. J., Ex. D (hereafter, the "Agreement").

[3] Agreement, at 1.

[4] Agreement, ¶ 1.

> as the beneficial title holder, shall retain the exclusive
> right to market the [Property], and may actively
> pursue the sale or other disposition of the [Property]
> as if it were the owner of the legal title thereof.[5]

In addition, the Agreement also requires Lovesac to reconvey the Property to a

third-party:

> At such time as Lovesac has fully repaid any
> financing for which [the Property] were used as
> collateral, which shall not be not later [sic] than May
> 15, 2005, Lovesac shall reconvey legal title to [the
> Property] to PMGH's nominee, POWDER
> MOUNTAIN GROUP II, LLC, and shall not retain
> any interest therein.[6]

On May 25, 2004, two days prior to the execution of the Agreement,

PMGH executed a warranty deed conveying title to the Property to Lovesac. The

deed was recorded on May 26, 2004. On or about May 24, 2004, Lovesac also

entered into a financing agreement with Triple Net Investments, Ltd. wherein

Lovesac borrowed $2.5 million, the repayment of which was secured by trust

deed on the Property.[7]

On December 6, 2004, Lovesac conveyed the Property back to PMGH by

executing a quit claim deed. The quit claim deed was recorded on December 7,

2004. The books and records of Lovesac reflect that no consideration was

received for the quit claim deed. The appraisal value of the Property, as of

February 23, 2004 was approximately $15 million.

---

[5] Agreement, ¶ 2.

[6] Agreement, ¶ 3.

[7] See Plaintiff's Br. in Support of Its Motion for Partial Summ. J., Ex. E.

The Liquidating Trust filed the instant adversary proceeding on January 29, 2008, alleging, *inter alia*, that Lovesac's conveyance of the Property by quit claim deed constitutes an avoidable fraudulent transfer pursuant to 11 U.S.C. § 548. Subsequently, the Liquidating Trust filed a Motion for Summary Judgment. The Defendants' oppose the Motion. The issues have been fully briefed and are ripe for decision.

## LEGAL DISCUSSION

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, directs that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[8]

Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law."[9] Its purpose is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."[10] Furthermore, summary judgment's operative goal is "to isolate and dispose of factually unsupported claims or

---

[8] Fed.R.Civ.P. 56.

[9] 11-56 MOORE'S FEDERAL PRACTICE, § 56.02 (Matthew Bender 3d ed.).

[10] *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

defenses"[11] in order to avert "full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."[12]

When requesting summary judgment, the moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[13]   In order to continue, the burden shifts to the nonmovant to identify "some factual disagreement sufficient to deflect *brevis* disposition."[14]   Not every discrepancy in the proof, however, is enough to forestall a properly supported motion for summary judgment; the "disagreement must relate to some genuine issue of material fact."[15]   In other words, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."[16]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[17]   The same

---

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[12] *Mesnick*, 950 F.2d at 822.

[13] *Celotex Corp.*, 477 U.S. at 325.

[14] *Mesnick*, 950 F.2d at 822.

[15] *Id*.

[16] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[17] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993))). *See also Mesnick*, 950 F.2d at 822. ("... 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[18]  At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a genuine issue for trial."[19]  A material fact is one which "could alter the outcome" of the case.  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[20]  Importantly, all reasonable inferences must be drawn in favor of the nonmoving party[21] and any doubt must be read in favor of the nonmovant.[22]

The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who "must present definite, competent evidence to rebut the motion."[23]  Such evidence "cannot be conjectural or problematic; it must have substance in the

---

[18] *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993) ("A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder [sic] could return a verdict in favor of the nonmovant."). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

[19] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del.2005) (quoting *Anderson*, 477 U.S. at 249).

[20] *Id*. at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

[21] *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n.2 (3d Cir. 2003).  *See also Interim Investors Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D.N.C. 1988), *aff'd*, 914 F.2d 1491 (4th Cir. 1990); *In re Holzinger*, 89 B.R. 529, 530 (Bankr. E.D. Pa.1988); and *In re Pashi*, 88 B.R. 456, 457 (Bankr. N.D. Ga.1988).

[22] *In re Cantin*, 114 B.R. 339, 341 (Bankr. D. Mass.1990); and *In re Dempster*, 59 B.R. 453, 455 (Bankr. M.D. Ga.1984).

[23] *Id*. *See also Mesnick*, 950 F.2d at 822.

sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[24]  Furthermore, evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment.[25]  In response, "the non-moving party must adduce more than a mere scintilla of evidence in its favor;"[26] it cannot simply reassert factually unsupported allegations contained in its pleadings.[27]  In other words, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[28]  Conversely, in a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[29]

## B. Constructively Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(B).

The Liquidating Trust asserts it is entitled to avoid the transfer of the Property pursuant to 11 U.S.C. § 548(a)(1)(B), which provides in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily:

---

[24] *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

[25] *Id. See also Anderson*, 477 U.S. at 249-50.

[26] *Id. See also In re CVEO Corp.*, 327 B.R. at 213.

[27] *See, e.g., Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[28] *PTC v. Robert Wholey & Co. (In re Fleming Cos.)*, 2006 Bankr. LEXIS 896 at *3 (Bankr. D. Del. 2006) (citing *Matsushita Elec. Indus. Co.*, 478 US at 1356).

[29] *Celotex Corp.*, 477 U.S. at 317.

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.[30]

Section 548(a)(1)(B) prohibits constructively fraudulent transfers. Although the section does not contain an intent element, fraud is presumed once the plaintiff establishes the requisite elements.[31] The elements of a constructively fraudulent transfer are: (1) the debtor had an interest in property; (2) a transfer of that interest occurred within two years of the bankruptcy filing; (3) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transfer resulted in no value for the debtor or the value received was not "reasonably equivalent" to the value of the relinquished property interest.[32]

PMGH does not contest that: (1) Lovesac held an interest in the Property; (2) that the execution of the quit claim deed constitutes a transfer within two years of the bankruptcy filing; or (3) that Lovesac was insolvent at the time of the transfer. Rather, PMGH asserts that even though Lovesac received no consideration for the quit claim deed, Lovesac received "reasonably equivalent value." PMGH argues that Lovesac only held "bare" legal title to the Property, which is valueless. Therefore, transferring a valueless asset for no consideration is a transfer for "reasonably equivalent value." The issue before the Court then, is

---

[30] 11 U.S.C. § 548(a)(1)(B).

[31] *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006).

[32] *Id*.

whether there is a genuine issue of material fact regarding the extent of Lovesac's

interest in the Property.

**C. PMGH's Alleged Reservation of Beneficial Title in the Property.**

PMGH asserts that, pursuant to the Agreement, PMGH retained beneficial

title to the Property, while Lovesac held only the "bare" legal title.  The

Agreement does purport to reserve "beneficial title" in favor of PMGH.

Paragraph 1 of the Agreement provides that "PMGH shall retain beneficial title

to [the Property]."[33]  In addition, paragraph 2 of the Agreement also contains a

clause purporting to limit the extent of Lovesac's interest in the Property:

> Regardless of the conveyance of legal title to the
> [Property] to Lovesac contemplated by this
> Agreement, and while Lovesac shall enjoy the right to
> pledge the same for the financing of its business
> activities as contemplated by this Agreement, PMGH,
> as the beneficial title holder, shall retain the exclusive
> right to market the [Property], and may actively
> pursue the sale or other disposition of the [Property]
> as if it were the owner of the legal title thereof.[34]

A "beneficial owner" is "[o]ne recognized in equity as the owner of something

because use and title belong to that person, even through legal title may belong

to someone else."[35]  "This concept, which creates a dual system of ownership,

---

[33] Agreement, ¶ 1.

[34] Agreement, ¶ 2.

[35] *Black's Law Dictionary* 1137 (8th ed. 2004).  *See also In re Worldcom, Inc.*, 343 B.R. 430, 439 (Bankr. S.D.N.Y. 2006) (using the *Black's Law Dictionary* definition of "beneficial owner" to interpret a contract referring to "beneficial title and interest").

generally arises in one of two situations – common law trusts and executory contracts for the sale of real estate."[36]

### i. Doctrine of Equitable Conversion.

Under the doctrine of equitable conversion, the purchaser takes beneficial or equitable title to real property once the parties enter into a land sales contract, and the seller retains the "bare" legal title.[37]   The doctrine of equitable title is not applicable in this case, as PMGH, which purported to retain beneficial title was the party transferring legal title to real property, not obtaining legal title.

### ii. Express Trust.

The other situation where a dual system of ownership may arise is that of trusts.   "A trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of beneficiaries."[38]   Under Utah law, to create an *inter vivos* trust, "a settlor must have an intent to create a presently enforceable trust, the trust property must be clearly specified and set aside, and the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a

---

[36] *In re Paradise Homes, Inc.*, 2008 WL 619330, at *3 (Bankr. S.D. Ill. 2008).

[37] *Butler v. Wilkinson*, 740 P.2d 1244, 1254-55 (Utah 1987).   Once the sale closes, the purchaser obtains the legal title as well, which then form a unified title.

[38] *Cont'l Bank & Trust Co. v. Country Club Mobile Estates, Ltd.*, 632 P.2d 869, 872 (Utah 1981) (*citing* Restatement (Second) of Trusts § 2 (1959)).

trust relationship."[39]   A trust must also have an identifiable beneficiary or beneficiaries who are capable of enforcing the equitable duties of the trustee.[40]

There is a genuine issue of material fact regarding whether the Agreement is sufficient to create an express trust under Utah law.   The Agreement is evidence that PMGH intended to create a trust to hold the Property, with PMGH, Lovesac, and Powder Mountain Group II LLC as beneficiaries, and Lovesac as the trustee.   Thus, the Agreement creates a triable issue of fact as to whether an express trust was formed, as the Agreement at least facially complies with the requirements to create an express trust under Utah law.[41]

---

[39] *In re Estate of Flake*, 70 P.3d 589, 594 (Utah 2003) (*quoting Sudquist v. Sundquist*, 639 P.2d 181, 183-84 (Utah 1981)) (internal quotations omitted).

[40] *Id.*

[41] The Liquidating Trust makes much of the fact that the Agreement was signed only by an agent for Lovesac, and no signature page was produced for PMGH.   However, under the Second Restatement of Trusts, Lovesac's signature, by itself, is sufficient to satisfy the statute of frauds.

§ 42. When And By Whom The Memorandum Should Be Signed—Transfer In Trust

Where the owner of an interest in land transfers it inter vivos to another person in trust, a memorandum properly evidencing the trust is sufficient to satisfy the requirements of the Statute of Frauds, if it is signed

(a) by the transferor prior to or at the time of the transfer; or

(b) by the transferee

(i) prior to or at the time of the transfer; or

(ii) subsequent to the transfer to him but before he has transferred the interest to a third person.

Restatement (Second) of Trusts § 42.  Since Lovesac, the transferee signed the Agreement after the Property was transferred to it, but before any interest was transferred to a third party, Lovesac's signature is sufficient to satisfy the statute of frauds.

In order to form an express trust, "the trust property must be clearly specified and set aside."[42]    Here, the Agreement identifies the Property as:

> Part of the SW4 of Section 33, T. 8 N., R. 2 E., SLB&M, and part of the NW4 of Section 4, T. 7 N., R. 2 E., SLB&M, beginning at the NE corner of the SE4 SW4 of said Section 33 and running thence South along the quarter section line 1,650.00 feet; thence north 89°48'52" west 2,640.00 feet; thence north along the west quarter section line 1,650.00 feet more or less to the northwest corner of the NW4SW 4 of said Section 33; thence south 89°48'52" east 2,640.00 feet to the point of beginning. (Serial Nos. 16-016-0005 and 16-001-0005)[43]

Accordingly, the Agreement provides a precise description of the property which is the subject of the Agreement.

Formation of an express trust also requires that, "a settlor must have an intent to create a presently enforceable trust . . . [and] the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a trust relationship."[44]   A trust must also have a beneficiary and a trustee.[45]   Here, the Agreement specifies the terms of the relationship between Lovesac and PMGH.  The Agreement states:

> PMGH agrees to **convey legal title** to [the Property] to Lovesac in fee to **permit Lovesac to use said lands as collateral for financing** required by Lovesac for its

---

[42] *In re Estate of Flake*, 70 P.3d 589, 594 (Utah 2003) (*quoting Sudquist v. Sundquist*, 639 P.2d 181, 183-84 (Utah 1981)) (internal quotations omitted).

[43] Agreement, ¶ 1.

[44] *In re Estate of Flake*, 70 P.3d 589, 594 (Utah 2003) (*quoting Sudquist v. Sundquist*, 639 P.2d 181, 183-84 (Utah 1981)) (internal quotations omitted).

[45] *Id*.

> ongoing operations and for its planned expansion activities, but **PMGH shall retain beneficial title** to said lands.   In connection with such conveyance PMGH agrees that PMGH does not have nor will it ever claim an interest in said lands which is superior to the interest of a lender to Lovesac which has taken a security interest in [the Property] as collateral for the funds advanced to Lovesac.[46]

This section of the Agreement, at a minimum, creates a triable issue of fact as to whether an express trust was created, as language in the above paragraph sets forth the basic framework of a trust.   Transfer of legal title to Lovesac, while PMGH retains "beneficial title" is evidence of intent to create a trust, wherein Lovesac is the trustee and PMGH is the beneficiary.   Moreover, as Lovesac is permitted to pledge the Property to obtain financing, the above paragraph is evidence that Lovesac was also a beneficiary of the trust.[47]

The Agreement discusses additional duties of Lovesac:

> Regardless of the conveyance of legal title to the [Property] to Lovesac contemplated by this Agreement, and while Lovesac shall enjoy the right to pledge the same for the financing of its business activities as contemplated by this Agreement, **PMGH, as the beneficial title holder, shall retain the exclusive right to market the [Property], and may actively pursue the sale or other disposition of the [Property] as if it were the owner of the legal title thereof**.[48]

---

[46] Agreement, ¶ 1.

[47] Under Utah law, a trustee may also be a beneficiary of the trust.  *Banks v. Means*, 52 P.3d 1190, 1191 (Utah 2002), overruled on other grounds by *Hoggan v. Hoggan*, 169 P.3d 750 (Utah 2007), (noting that in the trust at issue, the beneficiaries were to serve as joint trustees).

[48] Agreement, ¶ 2.

In addition, the Agreement also requires Lovesac to reconvey the Property to a third-party:

> At such time as **Lovesac has fully repaid any financing** for which [the Property] were used as collateral, which shall not be **not later** [sic] **than May 15, 2005**, Lovesac shall **reconvey legal title to [the Property] to PMGH's nominee**, POWDER MOUNTAIN GROUP II, LLC, and shall not retain any interest therein.[49]

The above paragraphs create additional duties of Lovesac, and corresponding rights in PMGH.  Specifically, PMGH was entitled to market and sell the Property.  In addition, Lovesac was required to reconvey legal title to PMGH's nominee after the borrowed funds were repaid, and in any event, no later than May 15, 2005.  The above paragraphs create definite and identifiable terms of the trust, which are clear enough for a court to enforce the equitable duties of the trust relationship.

Thus, the express language of the Agreement, on its face, contains sufficient evidence to create a triable issue of fact as to whether the Agreement created an express trust, since the Agreement, contains language to satisfy the elements of the creation of an express trust under Utah law.  Accordingly, there is a genuine issue of material fact regarding Lovesac's interest in the Property when it executed the quit claim deed.

---

[49] Agreement, ¶ 3.

### iii. Resulting Trust.

This conclusion is buttressed by the fact that courts frequently impose resulting trusts on real estate transfers where evidence reflects that the parties did not intend for the holder of legal title to be the true owner of the property.[50] The case of *In re Garcia* is instructive.[51]  In *Garcia*, the debtors' parents agreed to convey their house to the debtors in order for the debtors to obtain a mortgage, and promptly reconvey the property back to the debtors' parents.[52]  However, the debtors were unable to obtain a mortgage with the debtor-husband's name on the title, so the debtors conveyed the property solely to debtor-wife.[53] However, debtor-wife did not immediately reconvey the property to the debtors' parents until approximately four years later.[54]  The debtors filed a chapter 7 petition within one year of the debtor-wife's reconveyance of the house to debtors' parents.[55]  The chapter 7 trustee sought to avoid the conveyance of the

---

[50] *See Fleet Nat'l Bank v. Valente (In re Valente)*, 360 F.3d 256, 261-64 (1st Cir. 2004) (finding a resulting trust existed where debtor transferred legal title of real property to son shortly before bankruptcy in effort to defraud creditors); *Tolz v. Miller (In re Todd)*, 391 B.R. 504, 508-509 (Bankr. S.D. Fla. 2008) (finding a resulting trust existed to defeat trustee's action to avoid fraudulent transfer where debtor held bare legal title to property "parked" in her name in order to make the true property owner a more attractive candidate to finance a business venture); *McGranahan v. Dillard (In re Dillard)*, 2007 WL 3237165, at *3 (Bankr. E.D. Cal. 2007) (imposing a resulting trust on transfer of one-half joint tenancy interest in real property of debtor to former spouse to defeat an action by the trustee for fraudulent transfer).

[51] *Montoya v. Garcia (In re Garcia)*, 367 B.R. 778 (Bankr. D.N.M. 2007).

[52] *Id*. at 780.

[53] *Id*.

[54] *Id*.

[55] *Id*.

debtors' parents' home as a fraudulent transfer.[56]  The court imposed a resulting

trust on the transfer, and thus, the debtors had no equitable interest in the

property, noting

> [t]he warranty deed to Debtors was executed under
> circumstances which raise an inference that Parents
> did not intend that the Debtors taking or folding the
> property should also have the beneficial interest
> therein.   The facts demonstrate that Parents were
> "loaning" bare legal title to Debtors for a very limited
> period of time for a very limited purpose, with the
> expectation that the property would be promptly
> deeded back.[57]

Utah law also recognizes the concept of resulting trusts.[58]

Thus, in factual situations analogous to the case at bar, where one entity

transferred the title to property to another entity for purposes of obtaining

financing, courts routinely impose a trust on the parties, even in the absence of a

written trust agreement.

---

[56] *Id*. at 779.

[57] *Id*. at 785-86.

[58] *See Parks v. Zions First National Bank*, 673 P.2d 590, 598 (Utah 1983) (quoting Restatement (Second) of Trusts § 442 for the proposition that "[w]here a transfer of property is made to one person and the purchase price is paid by another and the transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property."); *Child v. Child*, 332 P.2d 981, 987  (Utah 1958) (imposing a purchase money resulting trust on land purchased by father, but purchased with borrowed funds from son, and title held in son's name).  *See generally* Restatement (Second) of Trusts § 404 ("A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.")

**D. Re-conveyance of Legal Title to the Property.**

The determination that a triable issue of fact exists regarding Lovesac's interest in the Property does not end the Court's analysis of the Motion.  The Liquidating Trust asserts that Lovesac was the fee simple owner of the Property and that Lovesac's execution of a quit claim deed for no compensation is a fraudulent transfer under § 548(a)(1)(B).  PMGH asserts that since it retained "beneficial title" to the Property and Lovesac only held "bare" legal title, Lovesac's title was valueless, and therefore the exchange of a valueless title for no compensation is a transaction for reasonably equivalent value under § 548(a)(1)(B).  The Court disagrees with both parties.

Assuming *arguendo* that the Agreement created an express trust, Lovesac was both the trustee of the trust, holding legal title to the Property, and a beneficiary of the trust, holding a beneficial interest in the Property as well.  Specifically, Lovesac was entitled under the terms of the Agreement to pledge the Property as collateral for a loan, and use the proceeds from the loan to fund its business operations.[59]  Lovesac's right to pledge the Property and use the loan proceeds for its own purposes creates a beneficial interest in the Property beyond Lovesac's legal title to the Property.

Lovesac's beneficial interest in the Property was of very limited scope and duration.  The terms of the Agreement, dated May 27, 2004, required Lovesac to

---

[59] Agreement, ¶ 1.  Of course, if Lovesac were only the trustee of the trust, it would be a breach of the trustee's fiduciary duties to pledge trust assets as collateral for a bank loan, and use the proceeds for the trustee's benefit.

reconvey the Property to PMGH's nominee no later than May 15, 2005.[60] However, Lovesac reconveyed the Property on December 6, 2004. At that time the Property was not fully encumbered, rather it was encumbered at approximately 20% of the Property's value.[61] Moreover, Lovesac still had a beneficial interest under the terms of the Agreement in excess of five (5) months wherein Lovesac was entitled to obtain funds using the Property as collateral. Accordingly, since Lovesac still possessed a beneficial interest in the Property for in excess of five (5) months at the time of reconveyance, Lovesac's interest in the Property was not valueless, but instead retained some value.

However, conducting a fraudulent conveyance analysis by only examining the December 6, 2004 execution of the quit claim deed is too circumscribed in scope. Rather, the entire transaction, as a whole, is the proper scope of inquiry. "Where an allegedly fraudulent transfer is merely one step in a general plan, the plan must be viewed as a whole with all its composite parts taken into consideration."[62] "It is well established that multilateral transactions may under appropriate circumstances be 'collapsed' and treated as phases of a single transaction for analysis under the fraudulent conveyance statutes."[63]

---

[60] Agreement ¶ 3.

[61] At the time Lovesac executed the quit claim deed, the Property was encumbered in the amount of approximately $3 million, and the Property's appraised value was $15 million.

[62] *In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 356 (C.D. Ill. 2006) (citing *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 934 (S.D.N.Y. 1995)).

[63] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 934 (S.D.N.Y. 1995) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995). See also *Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 212 (3d Cir. 1990)).

In this case, Lovesac's reconveyance of legal title to the Property is only part of the entire transaction as set forth in the Agreement.  Assuming, *arguendo*, that the Agreement creates an express trust, the transaction consisted of Lovesac providing PMGH with an unknown[64] amount of compensation in order for Lovesac to obtain legal title to the Property as trustee, and obtain a beneficial interest in the Property wherein Lovesac was entitled to pledge the Property as collateral for a secured loan, for a period of time slightly longer than one year. Viewed in this light, Lovesac's execution of a quit claim deed in December 2004 was not a fraudulent transfer, but a fulfillment of its duties as trustee under the Agreement.[65]

Accordingly, there is an issue of triable fact as to whether the transfer constitutes a fraudulent conveyance.

**E. Merger.**

The Liquidating Trust contends that the Court may not look to the Agreement to determine the nature and extent of PMGH's interest in the Property because Utah's merger doctrine operates as an absolute bar to any

---

[64] The Agreement states that "PMGH's compensation for such conveyance is set out in a Memorandum of Understanding of even date herewith involving the parties to this agreement." ¶ 1.  No such memorandum was included in the parties' papers.

[65] In fact, Lovesac's reconveyance of the Property was not in compliance with the Agreement, but to Lovesac's advantage.  The Agreement required Lovesac to reconvey the Property free and clear of all liens and encumbrances.  However, Lovesac reconveyed the Property with an approximately $3 million encumbrance.

In addition, the reconveyance of the Property was not in compliance with the Agreement since Lovesac reconveyed the Property to PMGH.  However, the Agreement requires Lovesac to reconvey the Property to "PMGH's nominee, POWDER MOUNTAIN GROUP II, LLC." Agreement, ¶ 3.

contention arising out of the provisions of an underlying contract for the Property's conveyance.   Under Utah law, the general rule of the doctrine of merger

> is that on delivery and acceptance of a deed the provisions of the underlying contract for the conveyance are deemed extinguished or superseded by the deed.  The basis for imposing the doctrine of merger is not due to any peculiar sanctity attaching to the deed itself, but because it is regarded as the final repository of the agreement which led to its execution.  The defense of so severe a rule must rest on the ground that in conveyances of land, the parties habitually put their full agreement in the deed, at least with reference to title and that if it is intended that the vendor shall be responsible for defective title, a warranty is inserted.[66]

Thus, the Liquidating Trust argues, that PMGH did not retain a beneficial interest in the Property, since such an interest was not included in the May 24, 2004 conveyance via warranty deed to Lovesac.

The Liquidating Trust has accurately stated Utah merger law in its papers. However, there are triable issues of fact regarding whether the doctrine of merger applies in this case, since there are triable issues of fact regarding the nature of the Agreement; specifically, whether the Agreement creates an express trust.  Merger doctrine only applies to a very specific factual scenario: land sale contracts.[67]  While the Liquidating Trust argues that the Agreement is a land sale

---

[66] *Secor v. Knight*, 716 P.2d 790, 792 (Utah 1986) (internal citations and quotations omitted).

[67] *Dansie v. Hi-Country Estates Homeowners Ass'n*, 987 P.2d 30, 35 (Utah 1999) (finding that under the doctrine of merger "the contract terms merged into the subsequent deeds conveying the property and were therefore extinguished as a matter of law"); *Secor v. Knight*, 716 P.2d 790, 792

contract in this case, there are triable issues of fact as to whether the Agreement creates an express trust, which would not constitute a land sale contract.

## CONCLUSION

For the reasons set forth above, the Court will deny the Liquidating Trust's Motion for Summary Judgment.  An appropriate order will be issued.

---

(Utah 1986) (noting the general rule regarding the merger doctrine is "that on delivery and acceptance of a deed the provisions of the  underlying contract for the conveyance are deemed extinguished or superseded by the deed"); *Stubbs v. Hemmert*, 567 P.2d 168, 169 (Utah 1977) ("The doctrine of merger, which this Court recognizes, is applicable when the acts to be performed by the seller in a contract relate only to the delivery of title to the buyer.  Execution and delivery of a deed by the seller then usually constitute full performance on his part, and acceptance of the deed by the buyer manifests his acceptance of that performance even though the estate conveyed may differ from that promised in the antecedent agreement.").